**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
02/21/2013

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case  No. 08-33932 |
| YOUSIF AYESH DAVID, | § | |
| | § | Chapter 13 |
| DEBTOR. | § | |

**MEMORANDUM OPINION REGARDING: (1) ORDER REQUIRING YOUSIF AYESH DAVID AND JIM L. CULPEPPER TO APPEAR AND SHOW CAUSE; AND (2) ORDER REQUIRING THE DEBTOR TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE SANCTIONED FOR:  (1) USING TWO DIFFERENT SOCIAL SECURITY NUMBERS IN FILING TAX RETURNS; AND (2) USING HIS BROTHER'S SOCIAL SECURITY NUMBER AND HIS BROTHER'S NAME IN FILING THE CHAPTER 13 PETITION INITIATING THE CHAPTER 13 CASE PRESENTLY PENDING BEFORE THIS COURT**
[Doc. Nos. 244 & 261]

## I.     INTRODUCTION

The show cause orders at issue in the case at bar arise from a Chapter 13 bankruptcy petition filed by the debtor (the Debtor) in 2008.  This bankruptcy petition, as well the Debtor's Schedules and Statement of Financial Affairs (SOFA), list the name of the Debtor as Yousif Ayesh David.  The bankruptcy petition, Schedules, and SOFA also list the social security number of the Debtor as XXX-XX-7035.  Further, in his Schedules, the Debtor lists three tracts of real property with a total aggregate value of $180,000.00.

In 2010, the Debtor's bankruptcy case was dismissed.  Yet, when the Debtor later initiated a separate lawsuit in state court, this Court learned of material discrepancies between the values of the real property tracts listed in the Debtor's Schedules and the values of these same tracts listed in the Debtor's state court suit.  This Court therefore issued a show cause order against the Debtor and his attorney in the state court suit, Jim Culpepper (Culpepper), regarding these inconsistent values (the First Show Cause Order).

At the resulting hearing, the Debtor testified before the Court that his name is Josef Daud and that his social security number is XXX-XX-6535; the Debtor also testified that his *brother's* name is Yousif A. David, and that his *brother's* social security number is XXX-XX-7035. Following this revelation, the Court issued a second show cause order (the Second Show Cause Order) requiring the Debtor to appear and show cause why he should not be sanctioned for: (1) using his brother's name[1] and social security number in filing his Chapter 13 petition; and (2) using two different social security numbers in filing his tax returns.

In this Memorandum Opinion, the Court discusses the Debtor's flippant disregard for the truth, and concludes that sanctions are appropriate. Additionally, the Court issues this Opinion to discuss its reasons for rejecting case law that would permit the availability of sanctions under Federal Rule of Bankruptcy Procedure 9011(b) in these circumstances: i.e., where the debtor was represented by counsel. The plain language of Rule 9011(b) provides that sanctions may only be issued against a debtor if he is "unrepresented." The Court instead concludes that sanctions against the Debtor are both available and appropriate under this Court's inherent power and its powers under 11 U.S.C. § 105(a).[2] By using a false name and false social security number to file his Chapter 13 bankruptcy petition, the Debtor has defiled the "temple of justice." *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999).

Based upon the entire record, the Court now makes the following written Findings of Fact and Conclusions of Law pursuant to FED. R. BANKR. P. 7052, as made applicable to this contested matter by FED. R. BANKR. P. 9014(c). To the extent that any Finding of Fact is

---

[1] As the Court concludes below, it is unclear whether the Debtor has a brother *at all* (named Josef Daud, Yousif David, or otherwise). The Debtor did not provide any evidence which confirms that the brother exists. Therefore, at this time, the Court finds that existence of the Debtor's brother is only alleged, and when appropriate, will use this term hereafter in this Opinion.

[2] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

construed to be a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of

Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to

make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II.        FINDINGS OF FACT

1.      On June 20, 2008, a Chapter 13 petition was filed to initiate Case No. 08-33932.  [Doc.

No. 1].  This petition was filed to stop a receiver from collecting a judgment against the

Debtor that had been awarded in a lawsuit styled "Star Markets, Plaintiff v. Yousif

David, Defendant, No. 2002-56891" in the 334th Judicial District Court of Harris

County, Texas (the State Court Lawsuit).

2.      The attorney of record who signed the Chapter 13 petition is Michael Walker (Walker),

who is a partner at the law firm of Walker Patterson, P.C. (the Law Firm).  [*Id.*].  Walker

had first met with the Debtor on June 19, 2008 to discuss the Debtor's concerns over the

hearing to be held on June 20, 2008 in the State Court Lawsuit on the receiver's pending

motion for turnover of the Debtor's real estate (on which two laundromat businesses were

operated).  [Tr. 01/13/12 at 34:11–36:5].  Walker recognized the urgent need to file a

bankruptcy petition to stop the receiver from going forward the next day in the State

Court Lawsuit to take control of the Debtor's real estate and laundromat businesses.  [*Id.*

at 35:21–36:5].  Walker, therefore, had the Debtor sit in his law office while Walker

inputted all of the information required to be included in the Chapter 13 petition, the

Schedules, and the SOFA.  [*Id.*].  Walker, therefore, asked the Debtor numerous

questions—"What's your name?  What's your address?  What's your social security

number?  Where do you live?"  [*Id.* at 36:11–12]—in order to complete the various

documents to be filed with the Clerk of Court.

3.       When Walker asked the Debtor what his name is, the Debtor stated "Yousif David."  [*Id.* at 36:16–18, 113:14–16].  Walker typed in this name on the petition.  The Debtor also informed Walker that he uses the name "Josef Daud" from time to time, and told Walker that this name is the same name as "Yousif David."  [*Id.* at 111:3–17].  Walker therefore added the name "Gosef K. Daud" on the petition.[3]  Additionally, the Debtor informed Walker that he also used his business name, which was David & Daud Enterprise[4].  *See* [Doc. No. 1].  Thus, in sum, Walker typed on the Chapter 13 petition that the name of the Debtor is Yousif Ayesh David, aka Gosef K. Daud, and aka David & Daud Enterprise.  [*Id.*].

4.       At the June 19 meeting, Walker also asked the Debtor for his social security number.  [Tr. 01/13/12 at 36:11–12, 19–23].  The Debtor responded by providing Walker with a social security number ending in XXX-XX-7035.  [*Id.* at 36:19–23].  Walker entered this number, and the social security number appearing on the Chapter 13 petition is XXX-XX-7035.  [Doc. No. 1].

5.       At the June 19 meeting with the Debtor, Walker also asked the Debtor to provide his social security card and driver's license.  [Tr. 01/13/12 at 36:1–14].  The Debtor did so, and Walker made copies of these two items.  [*Id.*].  The social security card that the Debtor gave to Walker for copying reflects that the Debtor's social security number is XXX-XX-7035.  [*Id.*].  Further, the Texas driver's license that the Debtor gave to Walker for copying reflected that the Debtor's name is Yousif David and that his Texas driver's license number is XXXXX169.  [*Id.*].  The Debtor never provided Walker with any other

---

[3]  It is unclear from the record why the petition uses the spelling, "Gosef," rather than "Josef."

[4]  In various places in the Debtor's Chapter 13 petition, the Debtor uses the names Enterprise (singular) and Enterprises (plural).  *Compare* [Culpepper Ex. No. 1 at p. 1], *with* [*Id.* at p. 8].  Generally, the Court will use the singular form of Enterprise, unless specifically quoting language that uses the plural "Enterprises."

social security card or driver's license.  [*Id.* at 41:10–24].  Under these circumstances, Walker believed that the Debtor's name was Yousif David.  [*Id.* at 42:12–15].

6. Also at the June 19 meeting, Walker asked the Debtor to provide him with his address, and the Debtor did so.  [*Id.* at 36].  Walker inputted this address onto the Chapter 13 petition, and the address showing on the petition is 13739 Ortega Lane, Houston, TX 77083 (the Ortega Lane Property).  [Doc. No. 1].

7. During the June 19 meeting, Walker, with the Debtor's assistance, typed in the required information on the Chapter 13 petition, the Schedules, and the SOFA.  [Tr. 01/13/12 at 35:16–36:13].  Walker, however, did not file these documents on June 19, 2008.  Rather, Walker sent the Debtor home with copies of these documents for him to review.  [*Id.* at 37:15–23].  Walker chose not to file these documents on June 19, 2008 because he first wanted to speak with his law partner, Johnie Patterson (Patterson), who was attending a CLE conference at the time.  [*Id.* at 37:23–38:3].

8. Walker was able to confer with Patterson on the evening of June 19, 2008.  [*Id.* at 38:1–3].  After this conversation, Walker decided that he would file the petition, the Schedules, and the SOFA on the following day after meeting with the Debtor.  *See* [*Id.*].

9. On the morning of June 20, 2008, the Debtor returned to the Law Firm and had a meeting with Walker.  At this meeting, Walker and the Debtor reviewed the petition, the Schedules, and the SOFA that they had worked up the previous day.  [*Id.* at 38:4–6].  Walker sat in a chair right next to the Debtor and reviewed with him all of the information set forth in these documents; Walker explained to him, line by line, and item by item, what these documents were requesting and what was provided, and verified with the Debtor that all of this information was correct.  [*Id.* at 40:1–41:7].  After Walker

reviewed all of these matters with the Debtor, the Debtor signed the Chapter 13 petition, the Schedules, and the SOFA. [*Id.* at 41:8–9]. Walker then filed the petition, the Schedules, and the SOFA on June 20, 2008 (the Petition Date). [Doc. No. 1]. As a result of this filing, the automatic stay took effect and the hearing scheduled to be held in the State Court Lawsuit was cancelled.

10. Schedule A represents that the Debtor owns three tracts of real property. [Doc. No. 1 at p. 6]. The first tract is the Ortega Lane Property, which the Debtor represents (in Schedule C) is his exempt homestead.[5] [*Id.* at p. 12]. The second tract is property located at 5116 Yale, Houston, TX (the Yale Property). [*Id.* at p. 6]. The Debtor represents that the value of the Yale Property is $30,000.00, and also represents that this value is not just the real estate itself, but also the laundromat that the Debtor owns and operates at this location. [*Id.*]. The third tract is property located at 4618 North Shephard, Houston, TX (the Shephard Property). [*Id.*]. The Debtor represents that the value of the Shephard Property is $60,000.00, and also represents that this value is not just the real estate itself, but also the laundromat that the Debtor owns and operates at this location. [*Id.*]. With respect to both the values of the Yale Property and the Shephard Property, the Debtor represents in Schedule A as follows: "Debtor owns ½ interest. Wife owns other ½. Value reflects value of Debtor's undivided ½ interest." [*Id.*]. Thus, the Debtor impliedly represents that the total value of the Yale Property (including the laundromat building and business located thereon) is $60,000.00, and the total value of the Shephard Property (including the laundromat building and business located thereon) is $120,000.00. Stated differently, the Debtor impliedly represents that the total

---

[5] As for the Ortega Lane Property, approximately twelve months prior to the hearing on the Second Show Cause Order, title to this tract was transferred from the name of Yousif David to the name of Josef Daud. [Tr. 01/13/12 143:22–144:3].

aggregate value of these two properties (including the laundromat buildings and businesses located thereon) is $180,000.00.  [*Id.*].

11.    On his Schedule B, the Debtor represents that he owns an entity called David & Daud Enterprises.  [*Id.* at p. 8].   The Debtor represents that the value of this interest is $22,400.00.  [*Id.*].  He also represents that this entity owns the 75 washers, the 55 dryers, the 2 coke machines, and the 2 candy machines that are collectively located at the Yale Property and the Shephard Property.  [*Id.*].

12.    The Debtor signed the Declaration Concerning Debtor's Schedules using the name Yousif Ayesh David.  [*Id.* at p. 25].   The Declaration Concerning Debtor's Schedules states that:  "I [i.e., the Debtor] declare under penalty of perjury that I have read the foregoing summary and schedules . . . and that they are true and correct to the best of my knowledge, information, and belief."  [*Id.*] (emphasis added).

13.    The Debtor also signed the SOFA using the name Yousif Ayesh David.  [*Id.* at p. 31].  The SOFA states that:  "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and they are true and correct."  [*Id.*] (emphasis added).

14.    On August 4, 2008, the meeting of creditors in the Debtor's case was held.  [Doc. No. 15].  The Debtor gave testimony under oath at this meeting.  Initially, the Chapter 13 Trustee's Staff Attorney, Richard Aurich (Aurich), examined the Debtor.  [Tape Recording, 08/04/08 Meeting of Creditors at 00:50-01:20].   The Debtor introduced himself to Aurich as Yousif David, and presented a social security card and driver's license reflecting that name.  [*Id.*].  Aurich verified that the name and social security number on these documents matched the name and social security number on the Chapter

13 petition.  The Debtor also once again swore to the accuracy of the information on the petition, the Schedules, and the SOFA.  [*Id.*].

15.  Additionally, at the meeting of creditors, the Debtor said both that Josef Daud is his alleged brother's name, and that he and his alleged brother both go by the name Josef Daud.  [Tape Recording, 08/04/08 Meeting of Creditors at 09:13-09:33, 16:04-16:37]. The Debtor also testified that he used his alleged brother's social security number when he (i.e., the Debtor) and his wife (Rosalia David) filed their 2007 tax return.  [*Id.* at 16:04-16:29].[6]

16.  At the meeting of creditors, when Aurich asked the Debtor for how much he was planning to sell the Yale Property and the Shephard Property, the Debtor responded by stating: "Approximately $250,000 to $300,000."  [Tr. 08/04/12 at 9:1].

17.  On July 20, 2009, this Court confirmed the Debtor's Chapter 13 Plan (the Plan).  [Doc. No. 201].

18.  On March 9, 2010, the Chapter 13 Trustee filed a motion to dismiss the Debtor's Chapter 13 case.  [Doc. No. 208].  The first basis of this motion was that the Debtor had failed to make all of his payments to the Trustee as required by the Plan and therefore that he was in default by $4,342.00.  [*Id.*].  The second basis was that the Debtor had submitted a personal check to the Chapter 13 Trustee in the amount of $2,921.00 that was returned due to insufficient funds.  [*Id.*].

19.  The Court set a hearing on this motion to dismiss for April 5, 2010, and then re-set the hearing several times to give the Debtor an opportunity to cure his defaults.  The Debtor failed to do so.  Accordingly, at the continued hearing held on July 12, 2010, this Court

---

[6]  Following the meeting of creditors, no one alerted this Court that the Debtor had filed his joint return in 2007 using his alleged brother's name and social security number.  The record is unclear as to whether the Trustee alerted the Internal Revenue Service to the Debtor's testimony.

granted the Trustee's motion to dismiss and signed an order to that effect.  [Doc. No. 223].

20.     On September 3, 2010—with the automatic stay no longer in place—the Receiver filed a pleading in the State Court Lawsuit entitled "Receiver's Application to Approve Sales Contract and Distribute Proceeds" (the Application).  [Culpepper Ex. No. 4].   The Application requested the state court to approve the sale of the Yale Property and the Shephard Property.  [*Id.*].

21.     On September 17, 2010, the state court approved the Application and authorized the Receiver to sell the Yale Property and the Shephard Property.  [Culpepper Ex. No. 5]. This order expressly included authorization to sell not only the real property, but also the fixtures and equipment located thereon (such as the washers, dryers, coke machines, and candy machines).  [*Id.*].

22.     On September 23, 2010, the Receiver did, in fact, sell the Yale Property and the Shephard Property.  [Tr. 12/02/11 at 104:16–20].   The total amount of the sale proceeds was $375,000.00.  [*Id.* at 106:10–12].

23.     As a result of these sales, the Debtor lost the Yale Property (and the laundromat building and business located thereon) and the Shephard Property (and the laundromat building and business located thereon).  [*Id.* at 36:1–8].  The Debtor was extremely upset and believed that the dismissal of his Chapter 13 case—and the concomitant loss of the protection of the automatic stay—was due to the negligence of his bankruptcy attorney, Walker.  [*Id.* at 36:9–37:19].

24.     Approximately 30 days after the sale of the Yale Property and the Shephard Property, the Debtor first met with Jimmy Culpepper (Culpepper).  [*Id.* at 104:16–20].  Culpepper is an

attorney at law in Houston, Texas who has been licensed since 1971 and is board certified in real estate law, civil trial law, and personal injury law.  [*Id.* at 104:1–11].

25.    The purpose of the meeting was for the Debtor to review with Culpepper why the Debtor believed Walker had committed malpractice.  Culpepper testified that "I found the facts to be very compelling" and "told him [i.e., the Debtor] that I would look into the case and, in particular, would talk with [the Receiver]."  [*Id.* at 105:3–5].

26.    Culpepper did, in fact, have communications with the Receiver and then met with the Debtor thereafter and told him that he (i.e., Culpepper) would represent him in a legal malpractice suit against Walker and the Law Firm.  [*Id.* at 106:7–109:10].  The Debtor gave Culpepper a retainer of $5,000.00.  [*Id.* at 108:1–4].

27.    On July 19, 2011, Culpepper filed an original petition initiating suit against Walker, the Law Firm, and three other defendants (who were also lawyers).  Culpepper filed this suit in the District Court of Harris County, Texas, and it is styled as follows:  "Josef Khlead Daud a/k/a Yousif David, Rosalia Barbara Daud a/k/a Rosalia Ayesh David, and David and Daud Enterprises, Inc., Plaintiffs v. Gary E. Parks, Donald D. DeGrasse, DeGrasse & Rolnick, Attorneys at Law, Michael Glen Walker, and Walker Patterson PC, Defendants, Cause No. 2011-42563, in the District Court of Harris County, Texas, 133rd Judicial District" (the Malpractice Suit).  [Culpepper Ex. No. 6].

28.    In the original petition, Culpepper, on behalf of the Debtor and the other plaintiffs, alleged, among other things, that Walker and the Law Firm had been negligent in their representation of the Debtor in his Chapter 13 case, including, but not limited to, failing to take action to prevent the dismissal of the Debtor's Chapter 13 case, thereby vitiating the protection of the automatic stay and allowing the Receiver to sell the Yale Property

and the Shephard Property.  [*Id.*].  Additionally, in paragraph 21, Culpepper made the following allegation:  "The value of the business and assets on the Yale St. Property and the N. Shephard Property were in excess of $1,000,000.00."  [*Id.* at p. 12, ¶ 21].

29.    Culpepper did not review the Debtor's Schedules prior to filing the complaint in the Malpractice Suit.  [Tr. 12/02/11 at 111:9–11, 124:21–24.  Indeed, Culpepper did not even review the docket sheet of the Debtor's Chapter 13 case prior to filing the complaint in the Malpractice Suit.  [*Id.* at 129:6–10].

30.    After Culpepper, on behalf of the Debtor, filed the Malpractice Suit, service of process was accomplished on both Walker and the Law Firm.  *See* [*Id.* at 129:18–19].

31.    Once service of process was accomplished, Culpepper had two telephone conversations with Walker about the Malpractice Suit.  [*Id.* at 130:3–131:2].  Additionally, Culpepper had a telephone conversation with Patterson, (Walker's law partner in the Law Firm). [*Id.*].  These conversations took place between July 21, 2011 (i.e., the date of the filing of the Malpractice Suit) and August 21, 2011.  [*Id.* at 133:20–134:1].

32.    In the phone call that Patterson had with Culpepper, Patterson informed Culpepper, among other things, that the allegation in the Malpractice Suit about the Debtor's businesses—i.e., "[t]he value of the business and assets on the Yale St. Property and the N. Shephard Property were in excess of $1,000,000.00"—was contrary to the aggregate value of these tracts of land set forth in the Debtor's sworn Schedules.  [*Id.* at 131:12–16].  During this call, Patterson also expressed his disenchantment to Culpepper about the filing of the Malpractice Suit; urged Culpepper to review the Debtor's Schedules; and told Culpepper that if he did not at least immediately amend his pleadings in the Malpractice Suit so that there was consistency with what the Debtor had represented in

his bankruptcy Schedules about the values of the Yale Property and the Shephard Property, then Patterson would file a motion to re-open the Debtor's bankruptcy case and bring to this Court's attention the Debtor's inconsistent positions about the values of the two tracts and the laundromat businesses situated thereon.  [*Id.* at 132:4–21].

33.   After Culpepper's telephone conversation with Patterson, Culpepper did *not* immediately amend the original complaint that he had filed to initiate the Malpractice Suit.  [*Id.* at 134:19–23].

34.   Because Culpepper failed to immediately amend the original complaint, on August 21, 2011, Patterson filed in this Court a Motion to Re-open Chapter 13 Case Pursuant to 11 U.S.C. § 350 (the Motion to Re-open).  [Doc. No. 229]; [Culpepper Ex. No. 7].  In the Motion to Re-open, Patterson brought to this Court's attention the fact that the Debtor was alleging in the Malpractice Suit that the aggregate value of the Yale Property and the Shephard Property, including the laundromat buildings and businesses located thereon, was of a certain value which was materially inconsistent with the aggregate value set forth in the Debtor's Schedule A filed in this Court.  [Doc. No. 229].

35.   This Court reviewed the Motion to Re-open in chambers, and decided to set a hearing on it.  On September 19, 2011, this Court issued a Notice of Hearing setting forth that it would hold a hearing on the Motion to Re-open on October 24, 2011 at 3:30 P.M.  [Doc. No. 230].

36.   On September 22, 2011, only after Patterson filed the Motion to Re-open *and* this Court set a hearing thereon, did Culpepper then file an amended complaint in the Malpractice Suit.  [Culpepper Ex. No. 8].  In this amended pleading, Culpepper deleted the sentence from the original complaint about which Patterson had complained—"The value of the

business and assets on the Yale St. Property and the N. Shephard Property were in excess of $1,000,000.00."—and replaced it with the following sentence: "[The Receiver] took possession of the Yale St. Property and the N. Shephard Property and sold both for $375,000.00.  The business and assets of the Yale St. Property and the N. Shephard Property were valuable."  [Culpepper Ex. No. 8].

37.    On October 19, 2011, the Court re-scheduled the hearing on the Motion to Re-open from October 24, 2011 to October 25, 2011.  [Doc. No. 233].

38.    On October 21, 2011, the Debtor, represented by Russell Van Beustring (Van Beustring), filed a response opposing the Motion to Re-open.  [Doc. No. 234].

39.    On October 25, 2011, the Court held a hearing on the Motion to Re-open.  [Doc. No. 137].  At the close of the hearing, this Court ruled that the Motion to Re-open should be granted.  [Tr. 10/25/11 at 9:18-19].  This Court also stated that it would issue a show cause order as to the Debtor and Culpepper because it was concerned about the inconsistent valuations declared by the Debtor in his bankruptcy Schedules and in his pleadings in the Malpractice Suit.  [*Id.* at 9:1-16].

40.    On November 3, 2011, this Court signed an order entitled "Order Requiring Yousif Ayesh David and Jim L. Culpepper to Appear and Show Cause" (previously defined herein as the First Show Cause Order).  [Doc. No. 244].  The First Show Cause Order sets forth that the Court is concerned about the inconsistent valuations declared by the Debtor in his bankruptcy Schedules and in his pleadings in the Malpractice Suit.  [*Id.*].  The First Show Cause Order then required the Debtor and Culpepper to appear and show cause why they should not be sanctioned for the following:

> valuing real property assets located at 5116 Yale and 4618 North Shephard at $90,000 on [S]chedule A (docket no. 1, page 6) in this

bankruptcy case on June 20, 2008 and subsequently valuing the same assets at over $1,000,000 in Plaintiff's Original Petition in case no. 2011-42564 filed in the District Court of Harris County on June 19, 2011.

[*Id.*].

41.     On December 2, 2011, this Court held a hearing on the First Show Cause Order.  [Doc. No. 257].  The following persons appeared at this hearing:  (1) Patterson, a partner at the Law Firm; (2) Miriam Goott (Goott), an associate attorney at the Law Firm; (3) the Debtor; (4) Van Beustring, who represented the Debtor in the Motion to Re-open; (5) Culpepper; and (6) Leonard H. Simon (Simon), representing Culpepper.  Both the Debtor and Culpepper gave testimony in defense of their actions.  At the close of the hearing on this day, this Court continued the matter because of, among other things, disturbing testimony that the Debtor gave about issues not identified in the First Show Cause Order, including testimony from the Debtor that he has been using his alleged brother's name, social security number, and driver's license—including using this information in completing the petition that he filed to initiate this Chapter 13 case.  [Tr. 12/02/11 at 174:10–177:6]. At the hearing, the Court asked the Debtor to remove his driver's license and social security card from his wallet.  The Texas driver's license that the Debtor gave to the Court for copying reflects that the Debtor's name is Josef K. Daud and that the Texas driver's license number is XXXX1058.  [Culpepper Ex. No. 12 at p. 20].  The Debtor also testified that his social security number is XXX-XX-6370.  [Tr. 12/02/11 at 53:6-9].  Nevertheless, the address listed on the Josef Daud driver's license is the Ortega Lane Property—i.e., the same address as on the license for Yousif A. David that the Debtor provided to Walker.  [Culpepper Ex. No. 12 at pp. 20–21].  Following this

testimony, the Court continued the hearing on the First Show Cause Order until January 13, 2012 at 9:30 A.M. [*Id.* at 179:6–8].

42.    On January 4, 2012, as a result of the Debtor's disturbing testimony at the December 2, 2011 hearing held on the First Show Cause Order, this Court issued a second show cause order entitled "Order Requiring the Debtor to Appear and Show Cause Why He Should not be Sanctioned for: (1) Using Two Different Social Security Numbers in Filing Tax Returns; (2) Using His Brother's Social Security Number and His Brother's Name in Filing the Chapter 13 Petition Initiating the Chapter 13 Case Presently Pending Before this Court" (previously defined herein as the Second Show Cause Order). [Doc. No. 261].

43.    On January 13, 2012, this Court held the continued hearing on the First Show Cause Order and held the initial hearing on the Second Show Cause Order; the hearings were held simultaneously. [Doc. No. 280]. The following persons appeared at this hearing: (1) Patterson; (2) Goott; (3) the Debtor; (4) Van Beustring, who represented the Debtor in the Motion to Re-open; (5) Culpepper; (6) Simon, representing Culpepper; (7) Walker, a partner at the Law Firm; (8) Thuha Hoang (Hoang), an accountant who prepared the 2007 tax return for Yousif Ayesh David; (9) Harris Kamal (Kamal), the individual who prepared the 2006 tax returns for Josef K. Daud and Rosalia B. Daud as well as David & Daud Enterprise, Inc. [Tr. 01/13/12 70:2–19]; and (10) Mary Eggers (Eggers), the individual who prepared the 2006 tax return for Yousif Ayesh David, the 2008 tax return for Josef K. Daud and Rosalia B. Daud and the 2009 tax return for Josef K. Daud and Rosalia B. Daud. [*Id.*]. Hoang, Kamal, Eggers, Walker, the Debtor, and Culpepper gave testimony on matters germane to both the First Show Cause Order and the Second Show

Cause Order.  [*Id.*].  At the end of the hearing on this day, the Court continued the simultaneous hearing on the First Show Cause Order and the Second Show Cause Order until February 8, 2012 so that the attorneys could have time to develop their closing arguments.  [*Id.*].

44.     On February 8, 2012, the Court heard closing arguments from all counsel on the issues raised in the First Show Cause Order and the Second Show Cause Order.  The Court then took the matter under advisement.

### III.     CREDIBILITY OF WITNESSES

At the hearings on December 2, 2011 and January 13, 2012, the following witnesses testified: (1) the Debtor in this Chapter 13 case; (2) Culpepper; (3) Hoang, an accountant who prepared the 2007 tax return for Yousif Ayesh David; (4) Kamal, a tax preparer for the 2006 tax returns for Josef K. Daud and Rosalia B. Daud, as well as David & Daud Enterprise, Inc. [Tr. 01/13/12 at 70:2–19]; (5) Eggers, a CPA who prepared the 2006 tax return for Yousif David, the 2008 tax return for Josef K. Daud and Rosalia B. Daud and the 2009 tax return for Josef K. Daud and Rosalia B. Daud; and (6) Walker, the Debtor's counsel in the Debtor's Chapter 13 case. After listening to the testimony, the Court makes the following observations and findings regarding the credibility of these witnesses.

### A.  Josef K. Daud

The Debtor testified on two different occasions:  December 2, 2011 and January 13, 2012.  On both occasions, the Court found multiple inconsistencies in the Debtor's testimony, which are outlined below:

1.   On December 2, 2011, when asked to state his name for the record, the Debtor responded that his name is Josef Daud.  [Tr. 12/02/11 at 15:22–25].  The Debtor also said that Yousif David, not Josef Daud, is his alleged brother's name.  [*Id.* at 48:17, 50:1–10].

This testimony directly contradicts assertions that the Debtor made under oath on his bankruptcy petition, Schedules, and SOFA.  There, he represented that his name is Yousif David.  [Doc. No. 1].  The Debtor's testimony also contradicts statements that the Debtor made at the August 4, 2008 meeting of creditors—also under oath.  At the meeting, he said that his alleged brother's name is Josef Daud.  [Tape Recording, 08/04/08 Meeting of Creditors at 16:24–16:58].  These two assertions—the hearing testimony and meeting of creditors testimony—are entirely contradictory.  From the Debtor's testimony, it is unclear whether the Debtor's name is Josef Daud and his alleged brother's name is Yousif David (as he testified on December 2, 2011), or whether the Debtor's name is Yousif David and his alleged brother's name is Josef Daud (as he represented under oath in his bankruptcy petition and at the August 4, 2008 meeting of creditors).

2.   At the same December 2, 2011 hearing, the Debtor made assertions about his 2007 and 2006 tax returns.  First, the Debtor admitted that he files tax returns under both his name (i.e., Josef Daud) and his alleged brother's name (i.e., Yousif David):  "I file taxes for Yousif David  . . . I file two names . . . I've been filing social security under Yousif David for a long time."  [Tr. 12/02/11 at 54:18–19, 55:23–24].  But, the Debtor then asserted that while he has filed tax returns under both names, he only files one tax return under a single surname—either Daud or David—per year.  [*Id.* at 95:13–19] ("[E]very time, every year, I file one [tax return under a single social security number] only.").  This testimony is patently false.

At the Court's request, the Debtor provided this Court with the tax returns that his wife and he filed in 2006, 2007, 2008 and 2009. They are summarized below, according to the year.

| Year | Name | Filing Status | Social Security # for the Debtor | Tax Preparer |
|------|------|---------------|-----------------------------------|--------------|
| 2006 | Josef K. Daud & Rosalia B. Daud | Married Joint | 6370 | Kamal |
|      | Yousif A. David & Rosalia David | Married Separate | 7035 | Eggers |
| 2007 | Yousif A. David | Single | 7035 | Hoang |
|      | Joseph[7] K. Daud & Rosalia A. David | Married Joint | 6370 | Savanna |
| 2008 | Josef K. Daud & Rosalia B. Daud | Married Joint | 6370 | Eggers |
| 2009 | Josef K. Daud & Rosalia B. Daud | Married Joint | 6370 | Eggers |

[Culpepper Ex. No. 12].

These returns reflect that in both 2006 and 2007, the Debtor filed <u>two</u> sets of tax returns—under his name (i.e., Josef Daud) <u>and</u> his alleged brother's name (i.e., Yousif David). The returns also demonstrate that the Debtor filed these returns under two separate social security numbers (i.e., -6370 for Josef Daud and -7035 for Yousif David).

3. The Debtor claims that he cannot read English despite living in the United States for "most of his life." [Tr. 12/02/11 at 20:7]. For example, early in his testimony, the Debtor's counsel, Russel Van Beustring (Van Beustring) asked him to turn to "Exhibit 2."

| VAN BEUSTRING: | Would you turn to Exhibit 2, which is the second tab there? |
|----------------|--------------------------------------------------------------|
| THE DEBTOR: | I need help with that . . . I can't read the English language. |

---

[7] It is unclear from the record why the 2007 tax return uses the spelling "Joseph" rather than "Josef".

[*Id.*].   The Debtor therefore claimed that he was completely unable to comprehend Van Beustrings's instruction and that he was entirely unable to read the trial exhibit numbers.

Later, however, the following exchange occurred, which contradicts this assertion.   The Debtor stated that he kept a list of his assets and their values.   This prompted counsel for Walker, Patterson, to ask: "[Q]uite frankly, what good does a piece of paper with writing on it do to a man who can't read?"  [*Id.* at 92:17–93:19].   The following exchange occurred:

| THE DEBTOR: | Well, a number, yes sir, I could read numbers . . . . . . |
|---|---|
| PATTERSON: | Can you read some English? |
| THE DEBTOR: | Very little.   Probably like a first grade – first grader, you know. |
| PATTERSON: | You can read and recognize letters, English letters, right? |
| THE DEBTOR: | Yes.<br>. . .<br>I can't read complete English . . .<br><br>Numbers, yes. |

[*Id.*].

Patterson then asked the Debtor if he recognized his Chapter 13 petition.   Rather than, again, assert a complete inability to comprehend the English language, the Debtor said, "[I]t looks like it." [*Id.* at 79:23].

The Court finds the Debtor's earlier claim—that he could not understand the "Exhibit 2" instruction [*Id.* at 92:17-93:19]—to be unbelievable.   As the Debtor admitted, he is at least able to comprehend numbers (like the number "2").   His feigned ignorance of English is not believeable.[8]

---

[8]  The Debtor's feigned ignorance was likely an attempt to suggest that his bankruptcy attorney, Walker, filed the Debtor's bankruptcy petition without seeking the Debtor's input or approval.  Indeed, later in the hearing, the Debtor implied that he did not, and *could not,* read any of the documents filed in his bankruptcy case and that Walker failed

4.   At the hearing, Patterson asked the Debtor a seemingly simple question:  "What is your name?"  [*Id.* at 42:4–5].  The following exchange ensued, of which only an excerpt is set forth below.  In total, it took <u>nine</u> minutes of testimony to establish the Debtor's name.  [Tape Recording, 12/02/11 Hearing at 11:12:30–11:21:30 a.m.].

| | |
|---|---|
| THE DEBTOR: | My name is Josef K. Daud in Arabic.  My name is Yousif David in English.  My name is Yousif Josef, or Josef David in Spanish.  Same name, different language. |
| PATTERSON: | So you gave the court your Arabic name and a Spanish translation today? |
| THE DEBTOR: | No.  An Arabic name is not – not English.  . . . |
| PATTERSON: | And why do you not use Joseph David?  Is that your English name? |
| THE DEBTOR: | Well, I use David as a business.  It's easier to deal with customers who pronounce it. |
| PATTERSON: | . . . What did you tell the U.S. Government your name is? |
| THE DEBTOR: | My passport says my name is Josef K. Daud. |
| PATTERSON: | . . . What does your driver's license say? |
| THE DEBTOR: | Josef K. Daud. |
| PATTERSON: | . . . [W]hat does your social security card say? |
| THE DEBTOR: | Josef K. Daud. |

[*Id.* at 11:12:10–11:13:45 a.m.].

Patterson then handed the Debtor a copy of the driver's license and social security card that the Debtor had presented to Walker at the time he filled out his bankruptcy petition.  The name on both documents is Yousif David.  The Debtor immediately indicated that both the driver's license and social security card belong to his alleged brother.  [*Id.* at 11:13:45–11:15:06 a.m.].

| | |
|---|---|
| THE DEBTOR: | Well, Yousif David is originally, is my brother.  I use – it is as mine for business, for corporation use. |

---

to review any of these documents with him prior to filing them with this Court; the Debtor claimed that he merely signed whatever Walker placed in front of him.  [Tr. 12/02/11 at 61:12–15, 62:8–10].

| PATTERSON: | And you also come in here in court and say, I'm Yousif David, right? |
| THE DEBTOR: | Because I've been doing that all my life, all this time, but business. |
| PATTERSON: | So, it's ok? |
| THE DEBTOR: | It's okay. |

[Tr. 12/2/11 at 48:17–24].[9]

5. At the hearing held on January 13, 2012, the Debtor testified that he had not written to his alleged brother, Yousif David, who he claims lives in Amman, Jordan, for ten years and that he did not know his alleged brother's address. [Tr. 01/13/12 at 117:16–20].

Yet later, Patterson asked the Debtor about the transfer of the Ortega Lane Property from the Debtor's alleged brother to the Debtor. *See* [Finding of Fact No. 23 n. 5] (indicating that the Ortega Lane Property was deeded from Yousif David to Josef Daud). The Debtor indicated that the transfer had occurred within the twelve months prior to the Debtor's testimony—i.e., after the Petition Date [Tr. 01/13/12 at 143:22–24]—and that the Debtor had requested by letter that his alleged brother transfer the Ortega Lane Property to him (i.e., the Debtor). [*Id.* at 149:15–21]. The following exchange then occurred:

| PATTERSON: | How did you come to find out that your brother was transferring the Ortega Lane [P]roperty to you, Mr. Daud? |
| THE DEBTOR: | I asked him. |
| PATTERSON: | You asked him on the phone or in person? |
| THE DEBTOR: | Through the mail. |
| PATTERSON: | Okay. So you wrote him [a] letter? |

---

[9] The Debtor also said that his "real" social security number is XXX-XX-6370, and that XXX-XX-6370 is "the only number I use, *except for my brother's social security* . . . I've been filing social security under Yousif David for a long time . . ." [Tr. 12/02/12 at 55:3–24] (emphasis added).

| THE DEBTOR: | Yes. |
| | . . . |
| | Want me to write [the address] for you, sir, over here? |
| PATTERSON: | Yes, please. |
| THE DEBTOR: | . . . |
| | That's his address, sir. |

[*Id.* at 149:15–151:24].  The Debtor wrote the following on a piece of paper in Arabic, which he interpreted for the Court:  first line: Jordan; second line: Amman; and third line: the street name.  [*Id.* at 152:1–153:6].  According to the Debtor, there are no street numbers in Jordan; rather, "[t]hey go by location . . . They go by where is they go."  [*Id.* at 152:22–24].

After the Debtor had finished writing, Patterson asked:  "And – so, earlier, when you testified that you didn't know your brother's address wasn't exactly right.  Right?  . . . The U.S. Postal Service could read this and will transmit this envelope?'"  The Debtor responded affirmatively, "[t]o the location."  [*Id.* at 153:7–12].

Thus, as Patterson summarized, the Debtor's testimony was entirely contradictory.  Either the Debtor always knew his brother's address and his first representation (i.e., that he had not written his brother for ten years and did not know his brother's address) was false; or later, when pressed, the Debtor simply made an address up.  Either way, both call the Debtor's testimony and credibility into serious question.

6.  Then suddenly, the Debtor testified that he had requested the transfer of the Ortega Lane Property by phone:

| THE DEBTOR: | Well, back I think on the phone, talked to [the Debtor's brother] too. |

| PATTERSON: | So, you talked to him about [the Ortega Lane Property transfer], also, now?  You phoned him or he phoned you? |
|---|---|
| THE DEBTOR: | If I remember, I think I phoned him. |
| PATTERSON: | All right.  And when was this? |
| THE DEBTOR: | I can't remember exactly what date. |
| PATTERSON: | You called him on your cell phone or your house phone? |
| THE DEBTOR: | . . . On house phone, sir.  . . . I'm still guessing.  I'm not sure. |
| PATTERSON: | . . . And do you know his number?  . . . |
| THE DEBTOR: | I don't have it in my memory, sir.  We have it in a book. |

[*Id.* at 155:7–156:7].  In sum, the Debtor testified that he had almost no recollection of **when** ("I can't remember exactly what date."), **where** ("On house phone, sir.  . . . I'm still guessing.  I'm not sure."), or **how** ("I don't have [the phone number] in my memory, sir.") the Debtor requested the transfer of Ortega Lane Property.  As a result, the Court finds the Debtor's testimony on this point to be so vague as to be unbelievable.

       7.  Patterson also tried to determine why the Debtor's alleged brother, Yousif David, had transferred the Ortega Lane Property to the Debtor, Josef Daud.  The Debtor's explanations were rambling and completely unbelievable, as the following exchange demonstrates.

| PATTERSON: | [W]hy 20 years [after purchasing the home], did your brother decide to deed the home to you? |
|---|---|
| THE DEBTOR: | . . . Because Michael Walker and Johnie Patterson took all my money, sir.<br><br>. . . |
| PATTERSON: | I took all your money? |
| THE DEBTOR: | Yes. |

| PATTERSON: | . . . But how did deeding [the] Ortega Lane [Property] to you get you money? |
|---|---|
| THE DEBTOR: | Felt sorry for me probably.<br><br>. . .<br><br>I don't have to pay no rent. |
| PATTERSON: | Is your testimony today that you were paying monthly rent to your brother? |
| THE DEBTOR: | No.  We have an agreement. |
| PATTERSON: | . . . Ok, so rent wasn't an issue, because you weren't paying rent.  So, how does the transfer of the house help you with money? |
| THE DEBTOR: | When my mother passed away, she left some money – gave it to [the Debtor's alleged brother]. |
| PATTERSON: | . . . [W]hen did your mother pass? |
| THE DEBTOR: | . . .<br><br>In the 90s.  I think so. |
| PATTERSON: | . . . Okay.  Explain to the Court how this money from more than 12 years ago had something to do with your brother transferring the Ortega Lane [P]roperty to you.   Just explain how that fits together.  Why it matters. |
| THE DEBTOR: | I just asked him I need the house.  I didn't have any business any more.  And it's my brother.  We care about each other. |

[Tr. 01/13/12 at 146:12–151:12].  The Court finds that the Debtor never explained the connection between the Debtor's mother's death, the bankruptcy, and the transfer of the Ortega Lane Property from Yousif David's name to Joseph Daud's name.  Further, the Court finds that the Debtor's response casts more doubt on his credibility.

8.   The Debtor also claimed that his alleged brother and he are in business together, which is why the Debtor says he often uses the name of his alleged brother, Yousif David.  [Tr.

12/02/11 at 45:5–9].  However, on the Debtor's Schedules, the Debtor lists "Ownership of David & Daud Enterprises" as personal property.  [Doc. No. 1 at p. 8].  The Debtor did not indicate that his ownership is a joint one with his alleged brother.  *See* [*Id.*].

Moreover, the Debtor was not able to name his alleged brother's wife, or state whether his alleged brother had children.  [Tr. 01/13/12 at 117:19–118:14].  He also stated that his alleged brother and he were "not that close family."[10]  [*Id.*].  When asked what his alleged brother's name is, the Debtor responded, "Yousif, I think."  [Tr. 12/02/11 at 51:9–13].  In fact, when asked if his alleged brother is even alive, the Debtor responded, "I think so.  I'm not sure either."  [*Id.*].

Based upon the Debtor's exceedingly contradictory and dissembling testimony, this Court does not believe that the Debtor and his alleged brother are in business together, or that this is why the Debtor uses his alleged brother's name.  The Court, in fact, doubts whether the Debtor even has a brother named Yousif David.  The Court finds the Debtor's testimony regarding his alleged brother to be wholly unreliable.

9.   At the December 2, 2011 hearing, the Debtor testified that he had not seen his alleged brother in 15 years.  [Tr. 12/02/11 at 51:12–15].  Consequently, counsel for Walker (i.e., Patterson) attempted to determine when the Debtor's alleged brother, Yousif David, had given the Debtor his (i.e., the alleged brother's) driver's license and social security card (which the Debtor presented to Walker when filling out his bankruptcy petition).  The Debtor was extremely evasive.  At the January 13, 2012 hearing, the following exchange occurred:

| PATTERSON: | How did you come into possession of your brother's driver's license? |
|---|---|
| THE DEBTOR: | It's been so long, I truly don't know exactly. |
| PATTERSON: | How long? |
| THE DEBTOR: | Been years.  I have no idea.  It's maybe, maybe |

---

[10] This testimony is especially odd—indeed, suspicious—considering that the Debtor and his alleged brother were purportedly so close that the Debtor's alleged brother transferred the title on the Ortega Lane Property to the Debtor merely by the Debtor requesting him to do so.  *See* [Tr. 01/13/12 at 149:15–151:24].

| | he left it at home. I'm not really sure. Left in my home. |
| --- | --- |
| PATTERSON: | When was he last at your home? |
| THE DEBTOR: | Been a long time? |
| PATTERSON: | Understand. More than ten years? |
| THE DEBTOR: | I would say yes, maybe more . . . |
| PATTERSON: | Well, let's try to pin it down a bit if we can. Was it last year? |
| THE DEBTOR: | No. |
| PATTERSON: | No. Was it before you filed the bankruptcy or after? |
| THE DEBTOR: | After – oh, no, before. Way before. |
| PATTERSON: | Before. So before 2008. . . . Would it be safe to say before the year 2000? |
| THE DEBTOR: | Yes. |
| PATTERSON: | All right. So, would it be safe to say your brother has not been to the states to see you in the 2000s? |
| THE DEBTOR: | Yes. |

[Tr. 01/13/12 at 123:16–124:10]

Patterson then tried to determine *how* the Debtor's alleged brother had given the Debtor

the driver's license and social security card.

| PATTERSON: | So [your brother] left [the driver's license] at your house? You're certain of that's how you came into possession of your brother's— |
| --- | --- |
| THE DEBTOR: | Not 100 percent, but I think – I think that's where I get it, at my house. I'm not sure 100 percent. It's been years, you know.<br>. . .<br>I think -- I think -- I think he -- I asked [my brother] for [the driver's license]. I asked him, "Can I use it?" Maybe something like that. |
| PATTERSON: | And I don't want you to say anything on the record that you're not sure of, Mr. Daud. |
| THE DEBTOR: | Well – none of it I'm sure of. |
| PATTERSON: | All right. But are you testifying under oath today that you recall, that you have a present memory, that you asked your brother for his driver's license? Is that what your testimony is today? |

| THE DEBTOR: | Sir, you put me under so much pressure. I'm 67 years old. My mind is not (indiscernible) anymore. There's so much pressure I went through. |
| PATTERSON: | But you volunteered this information.<br>. . .<br>You do recall that you obtained that driver's license more than ten years ago, right? |
| THE DEBTOR: | Yes. |
| PATTERSON: | And that is your sworn testimony today, right? |
| THE DEBTOR: | Yes. |

[*Id.* at 126:18–128:25].

Patterson then presented the Debtor with the driver's license that the Debtor had identified earlier as his alleged brother's and asked the Debtor questions about it and its renewal. The following testimony directly undermines the Debtor's earlier statements.

| PATTERSON: | . . . [Y]ou're familiar with a Texas driver's license, right? |
| THE DEBTOR: | I know what it looks like. |
| PATTERSON: | You know what they look like and you know you have to go and register for one right? |
| THE DEBTOR: | Yes.<br>. . . |
| PATTERSON: | About every five years, right? |
| THE DEBTOR: | Yeah.<br>. . . |
| PATTERSON: | . . . [T]his is your – this is what you proposed to be your brother's driver's license and social security card, right? |
| THE DEBTOR: | Uh-huh. [Affirmative] |
| PATTERSON: | David – Yousif Ayesh David, right? |
| THE DEBTOR: | Uh-huh. [Affirmative] |

| PATTERSON: | What is the expiration date on that driver's license? . . . 4/26/2012, right? |
|---|---|
| THE DEBTOR: | Right. |
| PATTERSON: | So that means that this license, whosever's it was, was renewed in 2007, right? |
| THE DEBTOR: | Right. |

[*Id.* at 131:18–133:9].

Thus, while the Debtor had testified that his alleged brother had left the driver's license at the Debtor's home sometime before 2000, the license itself contradicts this assertion—it had been renewed, either by the Debtor, by the Debtor's alleged brother, or someone else, in 2007.

Accordingly, the Court finds that all of the Debtor's testimony regarding the driver's license's origin to be unbelievable.

10.  The Debtor then shifted tactics, indicating that his name and his alleged brother's name are, in fact, one and the same—that they have identical names.  [Tape Recoding, 01/13/12 Hearing at 3:37:59–3:38:57 p.m.].

This testimony directly contradicts the representations that the Debtor made on his 2006 and 2007 tax returns, which were filed under two separate names, and two separate social security numbers.  [Culpepper Ex. No. 12]. This testimony also directly contradicts testimony given before this Court when the Debtor asserted that he, *not* his alleged brother, is named Josef Daud.  [Tr. 12/02/11 at 50:1–10].[11]

---

[11]

| PATTERSON: | There is a name.  A person is named Josef Daud. |
|---|---|
| THE DEBTOR: | Yes. |
| PATTERSON: | Do you understand that? |
| THE DEBTOR: | Yes. |
| PATTERSON: | Who is that? |
| THE DEBTOR: | That's me. |

The Debtor's testimony that his alleged brother and he have the same name is therefore false.  Yousif David and Josef Daud are simply not two people who share the same name.  They have different names, as evidenced by:  (1) their separate and distinct names and numbers on their respective driver's licenses [Finding of Fact Nos. 5 & 41]; [Tr. 12/02/11 at 96:8–18]; (2) their separate and distinct birth dates [*Id.* at 51:1–3] ("And your brother – how old's your brother?  Two years younger than me."); and (3) their separate and distinct social security cards and social security numbers [Finding of Fact Nos. 4 & 41]; [Tr. 12/02/11 at 53:6, 55:3–12].

Accordingly, this Court finds that Yousif David and Josef Daud are two different identities.  Their names and identifies are not interchangeable, and Yousif David and Josef Daud are not one and the same person.  The Debtor and his alleged brother—or whoever this other individual is—do not have the same name.

Furthermore, the Debtor <u>never</u> used the social security number ending in XXX-XX-7035 when referencing Josef Daud, and the Debtor <u>never</u> used the social security number ending in XXX-XX-6370 when referencing Yousif David, either before this Court or in his tax returns.  *See, e.g.*, [Finding of Fact Nos. 4 & 41]; [Culpepper Ex. No. 12]; [Tape Recording, 08/04/08 Meeting of Creditors at 00:26-00:50] (during which the Debtor introduced himself as Yousif David and the Trustee confirmed that the social security number that the Debtor provided at the meeting matched the XXX-XX-7035 provided on the Debtor's bankruptcy petition).  To the Debtor, these social security numbers were not interchangeable; they corresponded to two different people with two different names.  By only using the social security number associated

| PATTERSON: | All right.  Is that also your brother? |
| --- | --- |
| THE DEBTOR: | No. |
| PATTERSON: | It's not? |
| THE DEBTOR: | No, it's not. |

[Tr. 12/02/11 at 50:1–10].

with Yousif David when using the Yousif David name, and only using the social security number associated with Josef Daud when using the Josef Daud name, the Debtor himself viewed Yousif David and Josef Daud as two distinct identities.  The Debtor's actions, thereby, contradicted his trial testimony.

All in all, the Court finds that the Debtor is not a credible witness; therefore, the Court gives virtually no weight to his testimony.

**B.  Jim L. Culpepper**

Culpepper filed a petition in state court on behalf of the Debtor in a legal malpractice claim against Walker, and withdrew as counsel shortly thereafter, citing a conflict of interest.  He testified on December 2, 2011 concerning the material discrepancy between the respective valuations of the Debtor's property in the bankruptcy Schedules and in the state court malpractice pleading.  [Tr. 12/02/11 at 108:15–110:13].   He admitted that he "knew there was an inconsistency . . . ", but that he did not "go look and check it out." [*Id*. at 153:6–8].  He testified that he could have done more; in particular, he should have sought the assistance of a bankruptcy attorney.  [*Id*. at 111:11–23].

Culpepper also testified briefly concerning the Debtor's identity.  When asked whether he had examined the Debtor's driver's license and social security card during the initial client meeting, he testified that he normally does not. [*Id*. at 173:1–13].  Culpepper said that he knew, however, that "there was an issue as to the name, and so we [i.e., Culpepper and the Debtor] talked about that."  [*Id*. at 173:1–2].  As a result of this conversation, Culpepper concluded that the Debtor's name was Josef Daud, and that he simply used Yousif David as an unofficial alias.  This fact "didn't cause [him] a lot of problem," [*Id*. at 173:6–11], reasoning that "people from time to time, for various reasons," use different names.  [*Id*. at 173:12–13].

The Court finds Culpepper's lack of due diligence regarding both the valuation discrepancies and the Debtor's name to be troubling.  At a minimum, an attorney's curiosity should peak when a client presents himself under two different names.  Nevertheless, Culpepper's testimony was, for the most part, believable, and for this reason, the Court finds him to be a credible witness.  The Court therefore gives substantial weight to his testimony.

### C.  Thuha Hoang

Hoang is a certified accountant and CPA who prepared tax returns for Yousif Ayesh David in 2007.  [Tr. 01/13/12 at 11:5–18].  She testified briefly on January 13, 2012 regarding these returns.  Although she did not remember the Debtor or the specific returns, she confirmed her signature and indicated that she likely met with the Debtor in person in order to prepare the returns.  [*Id.* at 11:15–12:1].  She also credibly testified to the fact that she has never heard the names Josef Daud, Josef Doud, or David & Daud Enterprise, and that she did not prepare tax returns in these names.  [*Id.* at 13:13–14:8].   In sum, Hoang only knew the Debtor as Yousif David.  The Court finds Hoang to be a very credible witness, and gives substantial weight to her testimony.

### D.  Harris Kamal

Kamal is an accountant who prepared tax returns for Josef K. Daud and David & Daud Enterprise in 2006.  [*Id.* at 70:6–23].  When asked, he was able to point out the Debtor in the courtroom, identifying him as Josef K. Daud.  [*Id.* at 70:2–5].  The Court then asked if Kamal had ever heard the name "Yousif David."

| | |
|---|---|
| KAMAL: | No.  From him or in general? |
| THE COURT: | From him. |
| KAMAL: | No. |
| THE COURT: | Do you know if he has any brothers? |
| KAMAL: | No. |
| THE COURT: | So, you know this gentlemen [the Debtor] as |

|  | Josef K. Daud. |
|---|---|
| KAMAL: | Yes. |
| THE COURT: | Okay, and if he had told you that his name was Yousif David, what you're telling me is you would respond, "No, his name is Josef Daud"? |
| KAMAL: | Well, if he told me that it was Yousif David, then I'll definitely would like to correct this. |
| THE COURT: | Okay.  Meaning you'd like to correct [the 2006 tax return which indicates that the Debtor's name is Josef Daud]? |
| KAMAL: | Yeah.  I have to put the right name. |

[*Id.* at 72:13–73:5].

In sum, Kamal only knew the Debtor as Josef K. Daud.  The Debtor never introduced himself to Kamal as Yousif David, and never used the name Yousif David interchangeably with the name Josef K. Daud.  The Court finds Kamal to be a very credible witness, and gives substantial weight to his testimony.

**E.  Mary Eggers**

Eggers is a full time teacher and an accountant who prepared tax returns for the Debtor in 2006 under the name Yousif A David, and in 2008 and 2009 under the name Josef K. Daud. [Culpepper Ex. No. 12].  In her testimony, she confirmed her credentials, and that she prepared these returns.  [Tr. 01/13/12 at 184:3–17].  She claimed not to recognize the Debtor when initially asked by the Court, and had very little memory of the Debtor's tax returns, except to acknowledge that "[i]t looks like my credentials and everything . . . ." [*Id.* at 183:17–184:4]. Later, however, she was able to identify the Debtor in the courtroom as someone that she had seen before.  [*Id.* at 184:16–185:7].

The Court has no reason to question the sincerity of Eggers's testimony, but it is disturbing that Eggers filed tax returns for the Debtor in separate years, using different names and social security numbers.  This discrepancy, along with Eggers's initial inability to recognize

the Debtor, draws the accuracy of Eggers's memory into question.  The Court therefore finds Eggers to be only a somewhat credible witness, and gives only some weight to her testimony.

### F.  Michael Walker

Walker represented the Debtor in his Chapter 13 case, preparing the Debtor's petition, Schedules, and SOFA, extensively reviewing these documents with the Debtor to ensure that the information therein was accurate, and then filing them with the Court on the Debtor's behalf. Walker testified about the Debtor and this process.  [Tr. 01/13/12 at 34:11–67:5, 80:12–113:25].

During his own testimony, the Debtor blamed Walker for several of his own misdeeds. For instance, the Debtor claimed that Walker told him to use his alleged brother's social security number and to file his tax returns under his alleged brother's name and social security number. [Tr. 12/02/11 at 53:19–56:11].  Yet, when pressed, the Debtor admitted that he had been using his alleged brother's name (i.e., Yousif David) and his alleged brother's social security number (i.e., XXX-XX-7035) for years before he met Walker or filed his Chapter 13 petition.  [*Id.*].  The Debtor then admitted that Walker told him to file tax returns under the Debtor's "real name." [*Id.* at 57:14–15].  This testimony confirms the truthfulness of the testimony that Walker gave and undermines the credibility of the Debtor.

The Debtor also claimed that he failed to provide Walker with any information in order to prepare the list of assets and debts in his Schedules.[12]  [*Id.* at 83:9–85:15].  Walker, on the other

---

[12] The exchange between Patterson, counsel for Walker, and the Debtor was as follows:

| PATTERSON: | [This is] your voluntary petition, your Schedules, everything filed to start your bankruptcy case.  Do you ever remember seeing any of these papers before? |
|---|---|
| THE DEBTOR: | No. . . . |
| PATTERSON: | [I]s it your testimony, Mr. Daud, that you did not provide Walker and Patterson with any information to prepare your list of assets and debts for the Court? |
| THE DEBTOR: | I don't remember providing you with any of these. |

hand, testified to the contrary. *See, e.g.*, [Tr. 01/13/12 at 56:3–10] (quoting Walker who indicated that he kept the Debtor's 2005 tax return in the Debtor's file at the Law Firm).

Here, the Court believes Walker. It seems completely unbelievable that, out of thin air, Walker could simply manufacture the information provided in the Debtor's bankruptcy petition, Schedules, and SOFA. The Debtor had to provide Walker with some, if not all, of the information. This information includes the name and social security number listed on the bankruptcy petition.

Moreover, the Debtor claims that he gave Walker both Josef Daud's driver's license and social security card, as well as Yousif David's driver's license and social security card. [Tr. 12/02/12 at 95:22–24, 96:25–98:4]. He therefore contends that it was Walker's fault that only the Debtor's alleged brother's information was included in the bankruptcy petition. [*Id.*]. Yet, Walker specifically testified to receiving only Yousif David's social security card and driver's license, and as a result, Walker included only Yousif David's social security information on the Debtor's petition. [Tr. 01/13/12 at 37:1–14, 41:10–24]. If the Debtor had, as he testified, provided Walker with two driver's licenses and two social security cards, Walker would have been bound to ask extensive questions of the Debtor before filing his petition.[13] Nevertheless,

| PATTERSON: | Is it your testimony that you didn't provide us any information, that Mr. Walker just prepared these without any input from you? |
| --- | --- |
| THE DEBTOR: | As far as my knowledge, yes. |
| PATTERSON: | And that's your sworn testimony, today, that as far as you know, Mr. Walker worked on your Schedules and your assets without any input from you or your wife? |
| THE DEBTOR: | . . . <br> I don't remember providing *any* information. |

[Tr. 12/02/11 at 83:9–84:25] (emphasis added).

[13] As an attorney presenting a bankruptcy petition to the Court, Walker was required to comply with Federal Rule of Bankruptcy Procedure 9011(b), which states that attorneys must certify "that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions [contained within the bankruptcy petition] have evidentiary support or, if specifically so

the Debtor did not testify that Walker asked him any such questions.  *See* [Tr. 12/02/12 at 95:22–24, 96:25–98:4].  It is completely implausible to this Court that Walker would file a bankruptcy petition in a case where he himself questioned whether the Debtor was filing under a fraudulent social security number.[14]   It is more likely—and this Court so finds—that the Debtor gave Walker only one driver's license and one social security card—Yousif David's.[15]

Additionally, the Debtor claims that he signed his bankruptcy petition, Schedules, and SOFA without understanding them; that he merely signed whatever Walker placed in front of him.  [Tr. 12/02/11 at 61:12–15, 62:8–10].  This testimony directly contradicts Walker's testimony in which Walker recalled the Debtor's case in great detail.  [Tr. 01/13/12 at 38:4–41:9].  Walker clearly recalled this case and his pre-filing communication with the Debtor because it appeared to Walker that the Debtor had some trouble reading English.[16]  [*Id.*].  Walker

---

identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ."

[14] The Court notes that the Debtor did, in fact, disclose the name Josef Daud to Walker, and that Walker included this name on the bankruptcy petition.  [Doc. No. 1] (using the spelling "Gosef" Daud).  The Court does not believe that Walker included this name because he questioned the Debtor's identity.  Rather, the Court has already found that Walker always thought the Debtor's name was really Yousif David.  [Finding of Fact No. 5].  After all, the Debtor presented himself to Walker as Yousif David, stated the reason he was declaring bankruptcy was to prevent a receiver from collecting a judgment against Yousif David, and gave Walker a single, seemingly valid driver's license and social security number bearing the name Yousif David.  [Tr. 01/13/12 at 35:23–36:18, 37:6–14].  The Court therefore finds that Walker likely thought of Josef (or "Gosef") Daud as an unofficial nickname for the Debtor's *real* name:  Yousif David.

[15] This conclusion is supported by the Debtor's Chapter 13 petition.  As the petition—which Walker filled out—states, Yousif David also uses the alias:  "Gosef K. Daud."  Walker included this alias because at the time that he completed the Chapter 13 petition on the Debtor's behalf, he had the belief that Yousif David was the Debtor's real name and that any other names were aliases.  The spelling of Gosef Daud on the Chapter 13 petition, however, is different than the spelling on the Debtor's driver's license.  There, the name is spelled "*Josef* K. Daud."  If the Debtor had, in fact, provided Walker with the driver's license for this identity (i.e., Josef Daud), it seems implausibly odd that—while looking at the driver's license—Walker nevertheless misspelled "Josef" as "Gosef" on the Chapter 13 petition.  More likely, Walker wrote the name "Gosef K. Daud" phonetically as the Debtor spoke, thus, never seeing the driver's license bearing the spelling:  "Josef."  And, as the Court has concluded that Walker believed Josef (or Gosef) Daud to be the Debtor's unofficial nickname, Walker would have had no reason to ask the Debtor for a driver's license with this name in order to confirm its spelling.

[16] As opposed to speaking English.

testified that he therefore spent an extraordinary amount of time reviewing these documents with the Debtor.  [*Id.*].

The Court does not believe that the Debtor is as illiterate as he claimed in his testimony [Tr. 12/02/11 at 20:7]; yet, the Court does believe that as a non-lawyer, the Debtor likely has some difficulty reading and comprehending certain language contained in the Schedules, and SOFA.  Thus, the Court finds Walker's explanation for remembering the Debtor (as well as the lengthy review process that the Debtor and he completed prior to filing the Debtor's bankruptcy petition), *see* [Tr. 01/13/12 at 38:4–41:9], to be plausible.  Indeed, the Debtor confirmed his signature on several of the bankruptcy documents, verifying to this Court that Walker reviewed these documents with the Debtor before they were filed.[17]  [Tr. 12/02/11 at 64:15-24].  In order to sign the documents, the Debtor had to see them.  Moreover, it seems unlikely that the Debtor—a businessman and owner of the previously described laundromats [Finding of Fact Nos. 10 & 11]—would blindly sign something without requesting an explanation.  Thus, despite the Debtor's claim that Walker filled in all of the required information in the Petition, the Schedules and the SOFA without any input from the Debtor, and without reviewing these documents with the Debtor prior to filing them with this Court [Tr. 12/02/11 at 61:12–15, 62:8–10], the Court does not believe the Debtor.

In sum, this Court finds Walker to be a very credible witness, and gives substantial weight to his testimony.  Moreover, in any areas where the testimony of the Debtor and Walker conflict, the Court finds that Walker's testimony is accurate and truthful and the Debtor's testimony is inaccurate and untruthful.

---

[17] Including, for example, the Declaration for Electronic Filing, which the Debtor confirmed included his signature. [Tr. 12/02/11 at 67:6–15].

## IV. CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has jurisdiction over matters concerning the Debtor's conduct in this case pursuant to 28 U.S.C. §§ 1334(b) and 157(a).[18]  The particular matters set forth in the First Show Cause Order and the Second Show Cause Order constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), and the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").  Indeed, these matters are also core because the Debtor voluntarily filed a Chapter 13 petition and appeared before this Court, thereby giving this Court the jurisdictional authority to sanction any misconduct of the Debtor relating to his Chapter 13 case.  *Chambers v. NASCO*, 501 U.S. 32 (1991); *Knight v. Luedtke (In re Yorkshire, LLC)*, 540 F.3d 328, 332 (5th Cir. 2008).  Additionally, the acts leading to the issuance of the First Show Cause Order and the Second Show Cause Order occurred in a matter central to the administration of the Debtor's bankruptcy case.  Venue is proper pursuant to 28 U.S.C. § 1408(1).

### B.  Constitutional Authority to Enter a Final Order

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, this Court must also evaluate whether it has the constitutional authority to sign a final order regarding the show cause hearings.  131 S. Ct. 2594 (2011).  In *Stern*, the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by

---

[18] The First Show Cause Order also required Culpepper to appear and show cause why he should not be sanctioned for filing a pleading in the Malpractice Suit valuing the Yale Property and the Shephard Property at several hundred thousand dollars more than the values set forth by the Debtor in his original Schedules.  For reasons stated orally on the record at the hearing held on February 21, 2013, this Court has concluded that no sanctions will be imposed against Culpepper.

a Debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the counterclaim being adjudicated is based solely on state common law and does not affect the claims adjudication process. *Id.* at 2616.

The matter at bar is not a counterclaim of the Debtor's estate based solely on state law. Rather, this matter arises out of violations by a party appearing before this Court (i.e., the Debtor) of federal law, state law, and various Federal and Local Bankruptcy Rules. In particular, this matter arises from this Court's issuance of the First Show Cause Order and the Second Show Cause Order, both of which were issued in order to maintain the integrity of the bankruptcy system. This Court has the authority to sanction under its inherent authority, as well as 11 U.S.C. § 105(a) and applicable case law; according to this authority, the Court may police the conduct of parties appearing before it and impose sanctions on those who misbehave. *Chambers*, 501 U.S. 32; *In re Yorkshire, LLC*, 540 F.3d at 332. Thus, this matter is easily distinguishable from *Stern*. For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order imposing sanctions.

### C. Because He was Represented by Counsel, the Court Cannot Impose Sanctions on the Debtor under Rule 9011(b) and (c)

#### 1. Based on its Language, Rule 9011 Applies to Only *Unrepresented* Parties

"A sanctioning court should ordinarily rely on available authority conferred by statutes and procedural rules, rather than [any] inherent power, if the available source of authority would be adequate to serve the court's purpose." *In re Rimsat, Ltd.*, 212 F.3d 1039, 1048 (7th Cir. 2000). One such possible source of sanctioning authority is Federal Rule of Bankruptcy Procedure 9011(b), which has often been invoked to impose sanctions against

debtors.   The Court must therefore consider whether Rule 9011(b) is available in the proceeding at bar.

In pertinent part, the Rule itself states as follows:

(b) Representations to the court.  By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, — (1) it is not being presented for any improper purpose, . . . (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

Fed R. Bankr. P. 9011(b) (emphasis added).

Those who offend Rule 9011(b) may then be sanctioned under Rule 9011(c).  *In re Nair*, 202 F. App'x 765, 766 (5th Cir. 2006) (reviewing the bankruptcy court's imposition of sanctions under Rule 9011(c) for a 9011(b) violation and finding that the bankruptcy court did not abuse its discretion).   Subsection (c) provides that "if, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subsection (b) or are responsible for the violation."  FED. R. BANKR. P. 9011(c).   Any party may file a motion for sanctions under Rule 9011(c), or pursuant to Rule 9011(c)(1)(B) "on its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney . . . to show cause why it has not violated subdivision (b) with respect thereto."   FED. R. BANKR. P. 9011(c)(1)(B).

The plain language of Rule 9011(b) and (c) seems to limit its application to attorneys and *unrepresented* debtors.    Nevertheless, some courts have applied this rule more broadly, encompassing *represented* debtors as well.

### 2.   Rule 11 Applies to Unrepresented *and* Represented Parties

Rule 9011 is "essentially identical" to Federal Rule of Civil Procedure 11, *In re Park Place Assocs.*, 118 B.R. 613, 616 (Bankr. N.D. Ill. 1990), and therefore Rule 11 precedent may be applied to decisions under Rule 9011.  *H.J. Rowe, Inc. v. Spiegel, Inc. (In re Talon Holdings, Inc.)*, Nos. 97 B 37535, 97 A 01815, 1999 WL 150337 at *3 (Bankr. N.D. Ill. Mar. 19, 1999); *In re Park Place*, 118 B.R. at 616.  For its part, Rule 11(b) applies sanctions to two groups:  (1) those who *actually* violate Rule 11 by filing, submitting, or advocating a Rule 11-offending document to the court (i.e., attorneys and unrepresented parties); *and* (2) those who are *responsible* for violating Rule 11, not by filing, submitting or advocating a Rule 11-offending document to the court themselves, but by hiring counsel to file, submit or advocate the document on their behalf  (i.e., represented parties).  *In re Collins*, 250 B.R. 645, 659–61 (Bankr. N.D. Ill. 2000).  Rule 11(b) clearly applies to both represented *and* unrepresented parties.  *Id.*

### 3.   Some Bankruptcy Courts Apply the Rule 11 Analysis to Rule 9011

Applying this analysis to Rule 9011, the court in *Collins* found that Rule 9011 could encompass this same second group:  those who are *responsible* for violating Rule 9011—not by filing, submitting or advocating a Rule 9011-offending document (such as a bankruptcy petition) to the court themselves—but by hiring counsel to file, submit or advocate the document on their behalf.  *Id.* at 660–61.    Stated differently, *Collins* used Rule 11 to apply Rule 9011(b) to a *represented* debtor.  *Id.*

Though the *Collins* court recognized that Rule 11—and thus, Rule 9011—can only be used to sanction represented parties in "unusual circumstances,"[19] the court nonetheless believed sanctions were warranted in that case. *Id.* The represented debtor had purposely chosen to file bankruptcy solely to use the automatic stay as a sword. *Id.* He had thereby attempted to frustrate his only creditor—a creditor he was clearly able, but unwilling, to pay. *Id.* This "improper purpose" belonged to him, and he was therefore responsible for the resulting Rule 9011(b) violation. *Id.* Thus, despite failing to *actually* file his bankruptcy petition—an act executed by his attorney—the debtor was not absolved; he, too, had to suffer the consequences of Rule 9011.

4.  This Court Will Not Apply the Rule 11 Analysis to Rule 9011 Because the Language of Rule 9011 is Not Ambiguous; It Clearly Encompasses Only *Unrepresented* Parties

The Fifth Circuit has not analyzed this application of Rule 9011 so this Court has no binding precedent—one way or the other—upon which to rely. This Court must therefore decide for itself whether to accept or reject the analysis of the *Collins* court. While the result in *Collins* seems entirely appropriate under the facts of that case, this Court declines to adopt that court's analysis. When analyzing any statute or rule, the Court *must* begin its analysis with the words themselves. *Ron Pair v. United States,* 489 U.S. 235 (1989) (finding that a court's duty is to interpret a statute according to its plain language). If the language is vague, *then* the underlying rationale for the rule may be illuminating. Yet, as the Supreme Court has made clear, "[w]here . . . the statute's language is plain, 'the *sole* function of the courts is to enforce it according to its terms.'" *Id.* at 241 (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917) (emphasis added)).

---

[19] As the advisory committee notes to the Rule state in full, "[w]hen appropriate, the court can make an additional inquiry to determine whether the sanction [under the Rule] should be imposed on such persons, firms, or parties either in addition or, in unusual circumstances, instead of the person actually making the presentation to the court." Fed. Rule Civ. P. 11 advisory committee notes (1993). Thus, while Rule 11 may apply to represented parties, it should not be used except in exceptional situations.

The *Collins* court's analysis is based on Rule 9011's underlying rationale:  to deter attorneys and debtors from filing for bankruptcy for an improper purpose.  Yet, Rule 9011(b)'s language is not ambiguous.  The phrase "attorney or *unrepresented* party" clearly limits the Rule and its application to only those two groups; *represented* parties have been expressly excluded.  Thus, under its plain language, this Court concludes that Rule 9011(b) definitively requires that the Rule apply to *un*represented debtors alone.  Represented debtors may <u>not</u> be sanctioned under this particular Rule.[20]

In the case at bar, the Debtor was represented by counsel—both at the time he filed his bankruptcy petition, and at the time his case was reopened.  [Finding of Fact Nos. 2 & 38].  Thus, as a *represented* debtor, the sanctions under Rule 9011(c) are not available.

### D.  This Court Can Impose Sanctions on the Debtor under 11 U.S.C. § 105(a) and its Inherent Power

When other sources of authority are not available, courts may resort to their inherent powers, as "[t]here can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct presented before the court."  *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 283–84 (9th Cir. 1996) (citing § 105(a)); *Conner v. Travis County*, 209 F.3d 794 (5th Cir. 2000).  These inherent powers may only be employed to "fill in the interstices" that other provisions and rules do not reach.  *See Chambers*, 501 U.S. at 33, 46–47 ("[O]ther [sanction] mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions . . .  [W]hereas each of the other [sanction] mechanisms reaches only certain individuals or conduct, the inherent power extends to a full

---

[20] As the advisory committee notes to Rule 11 states, represented parties should only be held accountable under Rule in unusual and limited circumstances.  FED. RULE CIV. P. 11 advisory committee notes (1993).  This statement clearly is meant to limit Rule 11 and its reach.  Rule 9011, on the other hand, does not include a similar advisory committee notation.  Without such a note allowing Rule 9011 to extend—at least in limited circumstances—to represented debtors, it seems clear that Rule 9011 was not meant to extend to this group.

range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.").  In addition to the judicially-created inherent powers articulated in *Chambers*, § 105(a) of the Code specifically allows bankruptcy courts to issue any order that is "necessary or appropriate to carry out the provisions" of the Bankruptcy Code or "to prevent an abuse of process."  11 U.S.C. § 105(a).

In the case at bar, this means that while Rule 9011 cannot be used to sanction the Debtor's malevolent behavior (as the Debtor was represented by counsel [Finding of Fact Nos. 2 & 38]), the Debtor's conduct is *not* immune from sanction.  The Court may fill in this "interstice" with its § 105(a) powers, and, for that matter, may also do under its inherent powers. *Chambers*, 501 U.S. at 33, 46–47.

Before imposing such sanctions, however, certain key requirements must be satisfied. First, general complaints are insufficient.  *Goldin*, 166 F.3d at 722. Second, "[t]he imposition of sanctions using inherent powers must be accompanied by a specific finding of bad faith."  *Id.* Stated differently, the Court must find that the Debtor's conduct defiled the "very temple of justice." *Id.*

As the subject of the First Show Cause Order and the Second Show Cause Order, the Debtor has the burden to demonstrate the appropriateness or untruth of each area of concern identified by the Court in its Show Cause orders.  *See Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998); *Wyatt by and Through Rawlins v. Sawyer*, 80 F. Supp. 2d 1275, 1278 (M.D. Ala. 1999) ("The defendant may satisfy this burden by demonstrating either that she has in fact complied with the court's order, that she was unable to comply, that she was otherwise excused from compliance, or that sanctions would be inappropriate despite her noncompliance . . . . Regardless of which defense she chooses to present, however, the defendant's burden of

production requires that she provide detailed, specific evidence to support her contentions."). Here, the Court has identified three particular points of concern. The first area was identified in the First Show Cause Order, and the second and third areas were identified in the Second Show Cause Order. The three areas are as follows:

1.  Materially inconsistent valuations declared by the Debtor in his bankruptcy Schedules and subsequent state court litigation [Doc. No. 243];

2.  Use of two different social security numbers on the Debtor's tax returns [Doc. No. 261]; and

3.  Use of his alleged brother's name and social security number on the Chapter 13 petition to initiate the case pending before this Court.  [*Id.*].

### 1.  No Sanctions Shall be Imposed Against the Debtor Under the First Show Cause Order

The first point of concern arose from the Malpractice Suit, in which Culpepper, acting as counsel for the Debtor, stated that "[t]he value of the business and assets on the Yale St. Property and the N. Shephard Property were in excess of $1,000,000.00."  [Finding of Fact No. 28].  The Court issued the First Show Cause Order to require Culpepper and the Debtor to show cause why they should not be sanctioned for using this $1,000,000.00 valuation figure in the Malpractice Suit when the Debtor himself had valued these same assets in his Schedules at a figure that is several hundred thousand dollars lower.[21]  As the Malpractice Suit valuation was significantly larger than the valuation provided for the same properties in the Debtor's Schedules, the Court finds that Culpepper inaccurately inflated the value of the Yale Property and the Shephard

---

[21] Acts of an attorney are directly attributable to and binding upon the client.  *Clark v. Clark*, 244 S.E.2d 743, 744 (S.C. 1978); *Arnold v. Yarborough*, 316 S.E.2d 416, 417 (S.C. Ct. App. 1984).  Here, Culpepper's acts in the Malpractice Suit are directly imputed to the Debtor.

Property in the Malpractice Suit in order to increase the Debtor's claimed damages.  [Finding of Fact No. 32].

Nevertheless, Culpepper has already amended the pleadings in the Malpractice Suit to state that "[t]he business and assets of the Yale St. Property and the N. Shephard Property were valuable."  [Finding of Fact No. 36].  Accordingly, Culpepper has removed the offending, inflated valuation.  While the Court is not pleased with either the fast and loose approach that Culpepper took in his pleadings, or his slowness is amending the pleadings after Patterson informed him of the inconsistent values in the bankruptcy Schedules and the Malpractice Suit, Culpepper's conduct does not merit sanctions.  He has made the appropriate amendment to the pleadings, and the Malpractice Suit may now be tried without the stench of inconsistent values. And, because Culpepper's conduct does not merit sanctions, the Debtor, as Culpepper's client in the Malpractice Suit, should likewise receive no sanctions for this particular conduct.  *See Clark*, 244 S.E.2d at 744.

2.  <u>Sanctions Shall Be Imposed Against the Debtor Under the Second Show Cause Order</u>

As to the second and third areas of concern, however, the Debtor has failed to meet his burden to demonstrate that using two different social security numbers on his tax returns and using the Debtor's alleged brother's name and social security number on the Chapter 13 petition were proper.  Instead, the Court finds that each these actions were in bad faith and defiled the very "temple of justice."  *Goldin*, 166 F.3d at 722.  As a result, the Court concludes that sanctions should be imposed.

The Court recognizes that the traditions associated with individual names vary among cultures, and that Josef Daud and Yousif David *could* be culturally interchangeable versions of the same name.  *See In re Shah*, 350 B.R. 69, 73 (Bankr. S.D. Tex. 2006) (rejecting the same

"cultural differences" excuse from a debtor who also used a false name and social security number in his bankruptcy petition).  Granted, the Debtor did, in fact, disclose the name Josef (or "Gosef") Daud as an "aka" in his original petition.  [Finding of Fact No. 3].  Nevertheless, the Court concludes that Yousif David and Josef Daud are simply not the same person; they are two *different* identities, and the Debtor's use of the name and social security number associated with Yousif David on his Chapter 13 petition and his tax returns was therefore in bad faith.

The Court reaches this conclusion for several reasons.  First, Yousif David and Josef Daud have:  (1) separate and distinct names on their driver's licenses [Finding of Fact Nos. 5 & 41]; [Tr. 12/02/11 at 96:8–18]; (2) separate and distinct birth dates [Tr. 12/02/11 at 51:1–3]; and (3) separate and distinct social security cards and social security numbers [Finding of Fact Nos. 4 & 41]; [*Id.* at 53:6, 55:3–12].  The documentary evidence alone thereby demonstrates the existence of two separate and distinct identities.

Second, despite disclosing both the names Yousif David and Josef (or "Gosef") Daud name on his Chapter 13 bankruptcy petition, the Debtor did not disclose his social security number (i.e., the number ending in XXX-XX-6370).  [Finding of Fact Nos. 3 & 4].  Instead, the Debtor provided his attorney with only the driver's license and social security number associated with Yousif David—a number and driver's license which the Debtor later admitted was not his! [Finding of Fact Nos. 4, 5 & 41]; [Tape Recording, 12/02/11 Hearing at 11:13:45–11:15:06 a.m.].[22]

Furthermore, the Debtor <u>never</u> used the social security number ending in XXX-XX-7035 when referencing Josef Daud, and the Debtor <u>never</u> used the social security number ending in

---

[22] The photographs in the two licenses could reasonably be considered the Debtor, which is probably why when the Debtor first met with Walker to discuss filing a bankruptcy petition, Walker accepted—without question—that it was indeed, the Debtor in the Yousif David license.  *See* [Finding of Fact No. 5].

XXX-XX-6370 when referencing Yousif David, either before this Court or in his tax returns. *See* [Finding of Fact Nos. 4, 5 & 41]; [Culpepper Ex. No. 12].  To the Debtor, these social security numbers were not interchangeable; they correspond to two different people with two different names.  The Debtor himself understood Yousif David and Josef Daud to be two distinct identities.[23]  Thus, the names Yousif David and Josef Daud, and the social security numbers ending in XXX-XX-6370 and XXX-XX-7035, are *not* interchangeable.

In his testimony before this Court, the Debtor characterized the use of his alleged brother's name and social security number as "okay."  [Tr. 12/2/11 at 48:17–24].  This Court simply and categorically disagrees.  The Debtor's actions were not "okay," but rather eroded the integrity of the judicial system, as "[a] debtor's complete disclosure is essential to the proper administration of the bankruptcy estate." *Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 488 (Bankr. M.D. Fla. 1998); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984); *In re Hyde*, 222 B.R. 214, 219 (Bankr. S.D.N.Y. 1998), *rev'd on other grounds*, 235 B.R. 539 (S.D.N.Y. 1999) ("The obligation of full disclosure is crucial to the integrity of the bankruptcy process.").  Debtors must answer even the most basic questions in their Schedules and SOFA carefully, completely and accurately.  *In re Famisaran*, 224 B.R. 886, 891 (Bankr. N.D. Ill. 1998); *Casey v. Kasal (In re Kasal)*, 217 B.R. 727, 734 (Bankr. E.D. Pa. 1998), *aff'd*,

---

[23] At the meeting of creditors, the Debtor was asked whether he had filed tax returns under both the names Yousif David and Josef Daud in 2006 and 2007.  The Debtor said "No," declaring, "I can only be one person."  [Tape Recording, 08/04/08 Meeting of Creditors at 13:55–14:24].

This statement demonstrates two important points.  First, it shows that the Debtor recognized that filing under two names and two social security numbers implies to this Court that the Debtor is two different people.  These statements also show that the Debtor understood that he can only have one name at a time.  By filing two sets of tax returns under two different names in 2006 and 2007, the Debtor knew he was acting as two different people, with two interchangeable names, and <u>not</u> as one person.

Second, this is an example of a possible crime—perjury.  By claiming that he filed only one return per year, the Debtor lied under oath.  As he knew, he did, in fact, file two sets of tax returns in each of those two years.  *See* 18 U.S.C. § 1621 ("Whoever—(1) having taken an oath before a competent tribunal . . . , that he will testify, declare, depose, or certify truly . . . , willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury.").

223 B.R. 879 (E.D. Pa. 1998) ("The debtor is imposed with a paramount duty to carefully consider all questions included in the Schedules and Statement and see that each is answered accurately and completely."). Failure to make a full and accurate disclosure constitutes a bankruptcy crime[24]or, at a minimum, a violation of the Debtor's oath made by signing the petition.[25] Accordingly, nondisclosure of the Debtor's true name and social security number corroded the integrity and fair administration of the bankruptcy process.

Finally, despite any testimony to the contrary, it is clear to this Court that the Debtor's omission of his true name and social security number was intentional, and designed to confuse this Court. In other cases, courts have had to infer intentionality from circumstantial evidence. *In re Keeney,* 227 F.3d 679 (6th Cir. 2000). Here, such inferences are not required; the Court can listen to the Debtor's own words. *See, e.g.*, [Tr. 12/02/12 at 55:3–24].[26]

In sum, the Debtor has lived in the United States since he was a child [Tr. 12/02/12 at 20:7] and has demonstrated competent use of the English language. He also has considerable business experience. *See* [Finding of Fact Nos. 10 & 11]. The excuse for his misconduct is therefore not the result of cultural differences or lingual incompetence. Instead, the Debtor's actions demonstrate "deliberate misdirection." *In re Shah*, 350 B.R. at 73. Determining the Debtor's true name and identity has unnecessarily clogged this Court's docket and flagrantly

---

[24] Use of a false social security number in filing a bankruptcy petition is a crime under 18 U.S.C. § 152, whereby it is a crime when:

> A person who— . . . (2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; (3) knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury under section 1746 of title 28, in or in relation to any case under title 11.

[25] The Oath that the Debtor signed states that "I declare <u>under penalty of perjury</u> that the information provided in this petition is true and correct." [Doc. No. 1].

[26] For example, the Debtor testified that XXX-XX-6370 is "the only number I use, except for my brother's social security . . . I've been filing social security under Yousif David for a long time . . ." [Tr. 12/02/12 at 55:3–24]. He also stated that he has used his alleged brother's name, Yousif David, all his life. [*Id.* at 48:17–24].

wasted this Court's time. Under these circumstances, the Court concludes that the Debtor's actions were in bad faith and that sanctions should be imposed. If deliberately using someone else's social security number, driver's license, and name in filing a bankruptcy petition is not "defiling the very temple of justice," then nothing is.

       3.  <u>Appropriate Sanctions</u>

"Bankruptcy courts have broad leeway in forming an appropriate sanction for unethical behavior." *In re Zuniga*, 332 B.R. 760, 788 (Bankr. S.D. Tex. 2005). In other courts, sanctions have included dismissal of the debtor's case, awards of opposing counsel's attorney's fees, and bars to the refiling of a bankruptcy petition. *In re Yorkshire, LLC*, 540 F.3d at 333; *In re Essien*, 358 B.R. at 289. In *Chambers*, the Supreme Court stated the following:

> [A] primary aspect of [a court's inherent power] is the ability to fashion an appropriate sanction for conduct which abuses the judicial process . . . . [O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion. *Consequently, the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.*

501 U.S. at 44 (emphasis added) (affirming an assessment of the opposing party's entire attorney's fee as a sanction for bad faith conduct).

Using the Supreme Court's guidance, this Court is mindful that sanctions against the Debtor should be limited to what is sufficient to deter the Debtor and others from repeating such conduct. *In re Essien*, 358 B.R. 286, 289 (Bankr. S.D. Tex. 2006). Considering the severity of the Debtor's misconduct—including lying under oath on his bankruptcy petition, Schedules, and SOFA, and at the meeting of creditors *and* before this Court—the Court finds that an "assessment of attorney's fees" is warranted. *See Chambers,* 501 U.S. at 44 (internal quotation marks omitted); *In re Yorkshire, LLC*, 540 F.3d at 333; *In re Essien*, 358 B.R. at 289. The Debtor should be responsible for the following: (1) the reasonable attorney's fees and costs

incurred by the Law Firm for filing the Motion to Re-open; and (2) the reasonable attorney's fees and costs of the Law Firm for the time spent preparing for and participating at the hearings held on the First and Second Show Cause Orders. It is entirely appropriate that the Debtor pay these fees and costs because if the Law Firm had not filed the Motion to Re-open, and had not attended and participated at the Show Cause hearings, this Court would not have become aware of the shell game that the Debtor has been playing with his multiple identities and his use of more than one social security number.

In order to deter future wrongful conduct and deter others from repeating such conduct, the Court can also require the Debtor to pay appropriate sums to the Clerk of Court. *In re TAGT, L.P.*, 393 B.R. 143, 154 (Bankr. S.D. Tex. 2006) (citing *Fox v. Acadia State Bank*, 937 F.2d 1566, 1571 (11th Cir. 1991)); *In re Essien*, 358 B.R. at 289 (same). Given the egregiousness of the Debtor's conduct in the case at bar, this Court concludes also that he should pay $500 to the Clerk of Court for his filing of a bankruptcy petition knowing that it misrepresented to this Court his real name and social security number.[27]

## V.   CONCLUSION

Bankruptcy relief is a privilege; it is limited to the unfortunate, but *honest* debtor. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). In the case at bar, the Debtor has not been honest. He filed his bankruptcy petition, Schedules, and SOFA under a name and social security number that did not belong to him. Then, in an effort to explain away this untruth, the Debtor

---

[27] These amounts are properly payable via a cashier's check made payable to the Clerk of Court, as the purpose of requiring payments of these additional amounts is to deter future similar behavior rather than to compensate any private party. *In re TAGT, L.P.*, 393 B.R. at 156.

evaded, contradicted and misstated his name and identity so many times that even he may have lost track.[28]

At the August 4, 2008 meeting of creditors, the Debtor declared that he can use "any name" he wants to use. [Tape Recording, 08/04/08 Meeting of Creditors 16:40–16:54]. He is woefully wrong; this is not how the bankruptcy court and judicial system functions. Accordingly, the Court will impose the above-described sanctions on the Debtor with the hope that in the future, the Debtor will recognize the need to be truthful and respectful of both this Court and the entire judicial system.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.


Signed:  February 21, 2013

_____
Jeff Bohm
Chief United States Bankruptcy Judge

---

[28] For example, at the December 2, 2011 hearing, the Debtor testified that "I don't know how many years I used David, and I don't know how many years Daud." [Tr. 12/02/11 at 95:7–8]. Indeed, at various times in the case at bar, the Debtor was referred to as Yousif David, Josef Daud, Joseph Daud, Josef Doud, Gosef Daud and Josef David. The Court can imagine that it would be difficult to keep all of these names, their associated social security numbers, *and* the occasion and time of their use straight.